UNITED STATES *v.* LOGAN *et al.*

*(Circuit Court, N. D. Texas.  March Term, 1891.)*

1. CONSPIRACY—TO DEPRIVE OF RIGHTS HELD UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES.
   When a citizen of the United States is committed to the custody of the United States marshal or to a state jail by process issuing from one of the courts of the United States, to be held, in default of bail, to await his trial, on a criminal charge, within the exclusive jurisdiction of the national courts, such citizen has a right, under the constitution and laws of the United States, to a speedy and public trial by an impartial jury, and, until tried or discharged by due process of law, has a right under said constitution and laws to be treated with humanity, and to be protected against all unlawful violence, while he is deprived of the ordinary means of defending and protecting himself.

2. MURDER—COMMITTED IN THE PROSECUTION OF SUCH CONSPIRACY—JURISDICTION.
   Persons who conspire to deprive citizens of such rights are offenders under Rev. St. U. S. § 5508, and if in the commission of such offense murder is committed by them, are liable to be tried and punished in the United States courts for such murder under Rev. St. U. S. § 5509.

3. CONSPIRACY—ACTS AND DECLARATIONS OF CO-CONSPIRATOR.
   Each co-conspirator is liable for the acts and bound by the declarations of his co-conspirators, done or said during the continuance of the conspiracy, touching its object and conduct; and it is immaterial at what time he joined the conspiracy, or whether he was actually present when the particular acts were committed.

4. SAME—EVIDENCE—ACCOMPLICE.
   A conviction for conspiracy cannot be had on the uncorroborated testimony of a co-conspirator, nor can co-conspirators corroborate each other.

5. SAME.
   The fact that members of a conspiracy to offer violence to prisoners under arrest are in charge of them as deputy-marshals or guard does not lessen their guilt.

6. WITNESS—CONVICTED OF INFAMOUS CRIME.
   Persons convicted and punished for an infamous offense in the state courts are competent witnesses in the United States courts, their credibility being a question for the jury.

7. REASONABLE DOUBT.
   Jurors are not at liberty to doubt as jurors if they would believe as men.

At Law.

*Eugene Marshall*, U. S. Atty., and *W. L. Crawford*, Special Asst. U. S. Atty., for the United States.

*Jerome C. Kearby* and *Robert F. Arnold*, for defendants.

McCormick, J., (*charging jury*.) The undisputed evidence in this case shows that a short time before the October term, 1888, of the United States district court for the northern district of Texas, at Graham, the five brothers, Charles Marlow, George Marlow, Eph Marlow, and Alf Marlow, citizens of the United States, and one Boone Marlow, were arrested on warrants issued by F. W. Girand, a commissioner of the circuit court of the United States for the northern district of Texas, on complaints made by E. W. Johnson, who was then acting and duly commissioned and qualified deputy United States marshal for this district, charging said Marlows with an offense within the exclusive jurisdiction of the courts of the United States. That at the October term, 1888, of the said United States district court each of said Marlows was indicted for offenses within the exclusive jurisdiction of the courts of the United States, and was held in custody, under process from the courts of the United States, in the county jail of Young county, of which one M. D. Wallace, then sheriff of Young county, was *ex officio* jailer, until they were enlarged on bail. That after their enlargement on bail several of said Marlow brothers, with their mother and the families of Alf and Charles Marlow, went to live and labor on a farm in Young county, about 12 miles from Graham, known as the "Denson Farm." That on the 17th day of December, 1888, the third day after Boone Marlow was enlarged, said sheriff, M. D. Wallace, with one of his deputies, Tom Collier, went to the Denson farm about noon to arrest Boone Marlow on a *capias* out of one of the state courts to answer a charge of murder. That the said Boone Marlow, Charles Marlow, and Eph Marlow, with their mother and Alf and Charles Marlow's families, were in the house occupied by them, at their noon meal, when said Wallace and Collier approached said house. That as Tom Collier was about to enter the house firing occurred, and Sheriff Wallace was wounded. That thereupon Eph Marlow hurried to Graham for a physician. That immediately a high degree of excitement took possession of the minds of the citizens of Graham and of Young county. Eph Marlow was not permitted to return home, but was put in jail, and a *posse* of citizens brought in Charles Marlow, George Marlow, and Alf Marlow, and put them in jail, and shortly thereafter the bail of each of said Marlows duly surrendered them before said United States commissioner, and were released from their bail-bond, and said Marlows, under process issued by said commissioner to the marshal of this district, were by said E. W. Johnson, deputy-marshal, as aforesaid, again committed to the jail of Young county in default of bail, to be held to answer said indictments in the said United States district court. On the day of the wounding of Sheriff M. D. Wallace, Boone Marlow avoided arrest, and eluded the pursuit of the officers and citizens, and was never afterwards seen alive in Young county by those seeking his arrest. That.

Sheriff M. D. Wallace died on the 24th of December from the wound received by him on the 17th of that month. That thereupon the four Marlows, then in custody as aforesaid, were charged by complaint before a state examining magistrate with an offense against the laws of the state of Texas, and were by the proper peace officer of Young county brought from the jail of Young county, where they were being held as aforesaid, before said examining magistrate, and granted bail on said charge, and in default of bail were on this charge committed to the county jail of Young county. That on the night of the 14th of January, 1889, they made their escape from said jail, and were on the next day (15th) recaptured by the sheriff and his *posse*, and returned to said county jail. That on the night of the 17th of January, 1889, a body of men, armed and partially disguised, surrounded the steel cage in the county jail, in which the Marlows were confined, and threatened and offered violence to the Marlows, and attempted to seize Charles Marlow. That on the night of the 19th of January, 1889, said E. W. Johnson, acting, or assuming to act, as deputy-marshal as aforesaid, took actual possession and control of said four Marlows and of two other United States prisoners, W. D. Burkhart and Louis Clift, who were then in custody with said Marlows in jail; the said Marlows at the time being chained, two and two together, by irons riveted around one leg of each, and a chain securely fastened, coupling the two together. W. D. Burkhart and Louis Clift were fastened together in like manner. That the six prisoners, thus ironed and chained, two and two together, were placed in one hack, and P. A. Martin was put on this hack unarmed to drive it. That said E. W. Johnson, with Sam Criswell, Marion Wallace, and John B. Girand, all well armed, took another hack; and that Sam Waggoner and Will Hollis, also armed, took a buggy; and the three vehicles thus filled, and in close order, and in the order just given, started, after dark, but about or only a little before moonrise, towards Weatherford, on the regular mail stage road from Graham to Weatherford; and at a point just beyond Dry creek, and about two miles from Graham, a large number of men, armed and disguised, appeared in the highway, and, presenting their guns, commanded: "Hold up!" That the Marlow brothers immediately dropped out of the hack that they were in, and reaching the other hack, procured arms, and began to resist the assailants. That many shots were fired, and Alf and Eph Marlow were killed on the spot, and George and Charles Marlow and Louis Clift each severely wounded. All of the assailants who were able to flee fled, the deputy-marshal and his *posse* also fled, and George Marlow, Charles Marlow, Louis Clift, and W. D. Burkhart alone remained in sight, alive, with the dead bodies of Alf and Eph Marlow, and of Sam Criswell, Bruce Wheeler, and Frank Harmeson. That by unjointing the ankle of each of their dead brothers George and Charles Marlow freed themselves from the dead bodies, and, gathering sufficient arms and ammunition on the field of battle, they, with Clift and Burkhart, resumed their seats in the hack they had left, and made their way to Finis, a small village in the adjoining county of Jack, and only a few miles from said Denson farm. Here they unshackled Clift and Burkhart,

and Burkhart left them, and then Clift and the two surviving Marlows made their way by early morning to the cabin of the Marlows on the Denson farm, then occupied by the mother of the Marlows, their wives, and their little children. That in a very short time after the prisoners left the jail word was brought back to Graham of what had occurred at Dry creek, and runners were dispatched by Tom Collier, the then sheriff, to different parts of Young county, to warn the people that two of the Marlows had escaped, and to summon the people to be on the watch that night, and as many as could, and as soon as they could, to come to Graham, to organize for the capture of the surviving Marlows. A deputy-sheriff and constable were also dispatched at once to the neighboring county of Jack to solicit aid of the sheriff of that county with a *posse,* to assist in recapturing said Marlows: that by noon the next day the sheriff of Jack county, with a *posse* of 25 or 30 men, reached a point near the Marlows' cabin, where he found Tom Collier, (the sheriff of Young county,) with at least twice as large a *posse,* gathered from Young county, and in position near the cabin of the Marlows. That the Marlows refused to surrender to the state officers there present, but declared their willingness to surrender to the United States marshal, W. L. Cabell, or his deputy, Capt. Morton. That the sheriff of Jack county, as soon as he understood the situation, withdrew his men, and returned to Jack county. That Tom Collier, sheriff of Young county, kept a guard *posse* near said Marlow cabin until the morning of the 22d or 23d of January, when Capt. Morton arrived from Dallas, and took charge of the two Marlows and Clift, and removed them to Dallas.

In this court it is the exclusive province of the jury to pass on and decide all questions of fact, not only to judge of the credibility of each witness and the weight due said witness' testimony, but to decide what all the testimony permitted to go to you, taken together, proves as to the guilt or not of each of the accused. And you have to rely on your own memories as to the substance and particulars of the testimony, and act on your own impressions derived from the testimony considered, examined, and weighed by you, guided by the rules of law applicable thereto, as given you in the instructions of the judge presiding on the trial of the case. It is, however, in this court, the province and duty of the presiding judge to give you the benefit and assistance of his summing up or statement of the material features of the testimony. Such summing up or statement of the evidence by the presiding judge is not binding on you in the same manner that his instructions as to the law of the case bind you, but is only to aid you, and leaves still with you entire freedom and a perfect obligation to decide for yourselves as to all questions of fact involved in the case, and as to whether the guilt of the defendants, or of any particular defendant, is proved beyond a reasonable doubt. I have stated at considerable length the facts which I consider established by undisputed testimony, and practically admitted, showing that a conspiracy such as charged in the indictments did exist, and was attempted to be executed by more than two persons, and leaving as the only really contested issue on this trial the determination by you of this

question of fact: Whether the defendants, or any of them, were parties to said criminal conspiracy and murder. On that question my view of the law has required me to admit to you a very wide range of testimony, and I will now, as clearly and as briefly as I can, but necessarily at considerable length, call your attention to those features of the testimony which appear to me to bear on this contested and vital issue, embracing as incident thereto the questions of the credibility of the respective witnesses, and some of the circumstances of corroboration of those whose testimony is attacked. There is substantially no contradiction of the testimony tending to prove that the five Marlow brothers, Charles, George, Alford, Eph, (or Lewellin,) and Boone Marlow, lived, with their parents, a restless frontier life in Texas, the Indian Territory, the state of Colorado, and in the intermediate territory of New Mexico. That in 1876 or 1877, they sailed from Corpus Christi, in Texas, to Tuxpan, in Mexico, where they remained seven months, and, returning by sea to New Orleans, went up the Mississippi and Red rivers to Shreveport, and thence to the Indian Territory. That after the death of their father a few years ago, and the marriage of three of the brothers, they still kept together as one family, living with or near each other and with their mother, engaged in trading and driving stock, and in laboring at different kinds of work from time to time, until the arrest of four of them by E. W. Johnson, in the Indian Territory, in August, 1888, when said four—Charles, Alford, Boone, and Eph—were brought to Graham, and put in the jail of Young county. That very soon thereafter the remaining brother, George Marlow, with the women and children of the family, and what personal property they possessed,—some wagons, two mules, and about thirty-one horses,—followed the arrested brothers to Young county, and, while attempting to negotiate for making bond for his brothers, was himself arrested on a complaint made by E. W. Johnson, and placed in Young county jail. That none of said Marlow brothers had ever been arrested on a criminal charge, or placed in any jail or other place of confinement, before this. That neither of them offered any resistance to the deputy-marshal arresting them, or made any effort to evade arrest or to escape. That George Marlow was arrested without a warrant and put in jail the day before the complaint was made against him. That at the succeeding October term, 1888, of the United States court at this place, each of said Marlows was indicted separately, and some or all of them were joined in another indictment for larceny of horses in the Indian country. That said cases were continued by the government at that term of the court. That subsequently, and before the 17th of December, 1888, by pledging their personal property, the said Marlows obtained bail, and were at different times discharged from custody. That before the next term (March, 1889) of said court three of the said brothers had been killed, and the cases against them were dismissed by the court on the suggestion of their death made by the district attorney; and, the cases against the other two coming on for trial, the government offered no proof, and the jury returned a verdict of not guilty, and these surviving two—Charles and George Marlow—were ac-

quitted and discharged. That none of the horses or mules brought to Young county by the Marlows has ever since that time been claimed by any one as stolen property. That on the 1st day of December, 1888, there was returned into the state district court for Wilbarger county in this state an indictment against Boone Marlow, charging him with murder, for the killing of one J. H. Holson, in Wilbarger county, about the 15th of April, 1886. On this indictment there is a list of witnesses for the state in which appear, with a number of others, the names of E. W. Johnson and Sam Criswell, of Young county.

Boone Marlow was the last of the brothers released on bail in the cases in the United States court. He was released on Saturday, the 15th of December, 1888. The other brothers had settled, and were employed as laborers,—some of them on the farm of O. G. Denson, one of their sureties, about 12 miles from Graham, and another (George) on a farm controlled by Mr. Short, about 5 or 6 miles from Graham. And the testimony of George and Charles Marlow and of O. G. Denson, taken together, tends to show that Boone Marlow, when he was released on bail, Saturday, the 15th of December, went to the Short farm, where George Marlow was living, and the next day went to the Denson farm, where the other brothers were living, and where his mother was at that time; and that on Monday, the 17th of December, 1888, and about noon of that day, George Marlow was on the Short farm, and Alford Marlow was at O. G. Denson's house, several hundred yards from the Marlow house; and Boone Marlow, Charles Marlow, and Eph (or Lewellin) Marlow were in the Marlow house, eating, or about to eat, their dinner, when Tom Collier, then deputy-sheriff, and Marion Wallace, then sheriff, of Young county approached the Marlow house from the north side, which had no opening in it, and, separating, Tom Collier went by a window on the west side, (and opposite the door,) at which he stopped, alighted from his horse, looked in, and exchanged some words of salutation with the three brothers who were in the house. Charles Marlow testifies that the three brothers had just seated themselves at the table, which was by the window in the west side of the room, and opposite the door, with Lewellin at the side of the table, with his back to the door; Boone at the south end of the table, next to a bed, which was in the south-west corner of the room, and on which a Winchester rifle was lying; and Charles Marlow was at the north end of the table. That Boone, after the first salutation had been spoken, asked Tom Collier to come in and have some dinner, to which Tom Collier replied, he was not hungry, and Boone responded, "Come in anyhow." That none of them had yet seen Wallace, or knew that he was anywhere near their house. That almost immediately after Tom Collier left the window he stepped into the door with his hand on his pistol, drew it, and as Boone was rising from his seat at the table Tom Collier said, "Boone, I have come for you," and fired his pistol. That Boone dodged down, snatched the rifle from the bed, and as Tom Collier stepped behind the door Boone fired at him through the door or jamb of the door, and jumped to the door himself, and fired a second shot, and Wallace fell on the porch outside the door,

and Collier started to run. That Boone said he thought it was Tom Collier he fired the second shot at, and with his gun covering Tom Collier as he ran, told Tom to throw down his pistol, and come back and wait on Wallace. That Charlie had rushed to the porch, and, taking hold of Wallace, squatted down, and put Wallace's head on his, Charlie's, lap; and when Tom Collier came back Boone said, "Tom, you are the cause of this. You fired on me like I was a dog;" and Tom said, "I know it, but let us not say anything more about it;" when Boone said, "I ought to shoot him between the eyes." That Tom crouched down behind Charles, and asked Charles not to let Boone shoot him; and that he told Boone not to shoot, and he took his gun off of Tom. O. G. Denson came up at about this time, and he testifies that he heard Boone Marlow tell Tom Collier that "you [Tom Collier] are the cause of this." Both of these witnesses testify substantially that they then took Wallace in the room, and put him on a pallet on the floor, and that Wallace said that he had proper papers for the arrest of Boone Marlow, and told Mr. Denson: "To show you that I was justified in what I did, if you will look in my coat-pocket you will find the *capias* for Boone;" and that Denson then went out on the porch, where Wallace's coat had been hung up, where they took it off of him after he was shot, and in one of the pockets he (Denson) found a bundle of papers, a good large bundle, tied up with a string, several times around it; and on undoing this bundle and opening it and examining the papers he found the *capias* from the district court of Wilbarger county for the arrest of Boone on the charge of the murder of said J. H. Holson. These witnesses both testify substantially that they and the mother of the Marlow boys waited on Wallace, and did what they could to relieve his pain, and that Lewellin Marlow came to Graham for a doctor for Wallace, and to let his friends know he was shot. Alford went for some neighbors, and Tom Collier also left, and pretty soon returned with a number of men, and among them Frank Herron, who was a surety on some of the bonds of the Marlows, and who assumed, as such bail, to give them all up to Tom Collier, to be returned to jail, that the bail might be released from their bonds.

The testimony of several witnesses tends to prove that it was on this surrender by their bail that the four Marlow brothers were held in jail until the 24th of December, when they were taken before the commissioner, a discharge of the sureties entered on their bonds, and they recommitted by said commissioner. Pete Harmeson testifies that the next day or within a day or two after the burial of Sheriff Wallace, Bruce Wheeler asked him if he would join a mob to lynch the Marlows, and, on his refusing, had a protracted conversation on the subject, in which this witness remonstrated warmly against said Wheeler going into such a venture. Mrs. Lauderdale and her daughter, now Mrs. Simpson, but who was then the wife of Sam Criswell, and with her said husband, Sam Criswell, was then living with her mother, both testified substantially that on one evening between the burial of Wallace and the mob at the jail, the exact or more approximate date of which they are unable now to fix, the defendant Eugene Logan, Will Benedict, and William

Williams, commonly called "Bee Williams," were, with Sam Criswell and these witnesses, in Mrs. Lauderdale's room at her house in Belknap, and talking about the Marlows, when Sam Criswell spoke of their being bad men, and their having tried to get away, and to kill him and Ed Johnson, and said they ought to be killed, the last one of them, men, women, and children. Bee Williams said they ought to be mobbed, and that he was willing to help mob them at any time. Bill Benedict said they all ought to be killed off; that if they were turned loose they would burn the town; and Logan said the others had the Marlows down meaner than they were; that he thought the law should be let to take its course, and allow them a fair trial; that if they had been as mean as the others said, they would have killed Tom Collier, too, when they shot Wallace; that they could have done it. These witnesses saw Eugene Logan after the fight at Dry creek, and he first told them that one of the Marlows, naming him, killed Sam Criswell; then in a second conversation he told a different story about it; and in a third conversation he said he did not know who killed Criswell; he thought Criswell was killed before he (Logan) got back there; that he (Logan) had rode ahead, as an advance guard, and had gone beyond where the mob appeared a hundred yards or two, and when he heard the loud talking he rode back and the firing had begun; that when he got back he got off his horse, and dropped his bridle reins; that a man commenced shooting at him, whom he took to be Charles Marlow, and that he (Logan) returned the fire, and continued to fire until he shot away all his loads; that he stood with his side to Charles Marlow, or to the man shooting at him, and the man shot at the bulk, was the way he escaped as well as he did, but that he was wounded, and had to get down and crawl off; that he raised himself up, and tried to reload his pistol, but could not, and that if he could have loaded it he thought he could have killed all of them from where he lay. These witnesses say that in conversation with them he complained of Ed Johnson, and said if Ed Johnson had done as Criswell told him to do, that no one would have been hurt but the Marlows; that Criswell had told Johnson to run a rope through the shackles, and tie the ends of the rope to the brake or to the bottom of the hack. Marion Lasater says that on the night of the tragedy, and early the next day, as often as three or four times, he heard Tom Collier say, or heard Will Hollis or Dick Cook or Marion Wallace say, in Tom Collier's presence and hearing, that Logan was not a guard. Several witnesses testify substantially that during that night and the day following, and while the heat was still up, they heard Tom Collier say, or heard others in his presence and hearing say, that Logan was with the mob; and O. G. Denson says that he heard Collier at that time say that Logan could not get out of it unless he died out of it, or run out of it; that he had the marks of it on him. Capt. Morton says that when he arrested Logan, soon after the fight, and while Logan was still at the Woods House, confined by his wounds, Logan said: "This is hard, to go as a guard of the prisoners and get wounded, and then be arrested for it;" and that he, Morton, then went to Ed Johnson, who was still

confined to his house with his wound, and told Johnson what Logan said, and asked Johnson: "Ed, how is this?" and Johnson said: "It's no such thing. Logan was not one of my guards." This witness, on cross-examination, says some reference was made to Tom Collier by Johnson in this conversation, but he cannot now remember that Johnson said Logan was or might have been one of Collier's guards. Four witnesses, —Burns, Spears, Charles Marlow, and George Marlow,—who were in the jail on the 17th January, 1889, when the mob entered the jail, all say that Logan was at that time with the mob, and partly disguised, and armed with a gun, and took a commanding and leading part in what was done and said on the part of the mob on that occasion. John Taylor and others testify to the levity Logan indulged in the next day when relating the occurrence at the jail on the night of the 17th January. Broiles and Kramer both say that Criswell had a brown horse at their stable, and that late in the evening of Saturday, the 19th of January, Criswell instructed them to let Logan have his (Criswell's) horse if Logan called for said horse; and Broiles testifies that after dark that evening, Logan, in company with Bee Williams, did call for Criswell's horse, Williams at same time calling for his, and both Logan and Bee Williams mounted and rode off together, going west on the road that goes to Belknap from Graham. Jim Duty says that he got to the scene of the battle among the first who went out from town after word was brought in of what had occurred on Dry creek, and that in the pasture on the south side of the road he saw three horses—a grey, a sorrel, and a brown horse—standing together, a short distance inside of the Johnson pasture, and about 75 yards east of the gate. He did not examine to see whether they were hitched. When this witness saw these horses they were standing facing towards the fence, the brown horse standing between the other two. The brown horse he knew to be Sam Criswell's horse. It was his understanding that Bruce Wheeler's horse was a sorrel, and he had heard that Frank Harmeson's was a grey. Both of the Marlows and P. A. Martin, who were in the front hack, and John Girand, who was in the next hack, say they did not see any horseman in advance of their hacks at any time, and they did not see any horseman ride up after they were halted by the mob, and none of them had any knowledge that Logan was at Dry creek at all, until he was found, severely wounded, in Johnson's pasture, first by P. A. Martin, and afterwards by others, who came out after the news of the fight had reached town, and who helped him into a hack, and brought him to town. There is no conflict in the testimony to the effect that the scene of this tragedy was at a point immediately on the east bank of Dry creek on the Weatherford road in a lane between two pastures, which lane extends west towards Graham about one-half mile, and east along said road more than a mile; that the land inside the north pasture east of Dry creek is cleared and cultivated land, and there is no gate at that point entering said pasture, while the land inside the south pasture—the Johnson pasture—is at that point uncleared, and is covered with large trees and more or less underbrush, and a few yards east of the battle-ground there is a gate.

Much testimony in this case tends to prove that Bee Williams was a party to said conspiracy, and the witness Bailey Allen testifies that on the day preceding the night attack on the jail he observed Eugene Logan and Bee Williams standing on the east side of the public square, not far from the jail, and some distance from any occupied house, and apart from all other persons, and apparently engaged in earnest private conversation; that during an hour or more, in the prosecution of his work, he passed them several times, and observed them each time in the same place, and similarly engaged, and that it so challenged his attention as to elicit from him at that time the comment, "Something must be up."

These appear to me to be the leading features of the evidence relating to Logan's connection with the conspiracy. It would too greatly extend this charge for me to give in full detail all the evidence I have permitted you to receive on this issue. Such a statement in full detail of all the evidence, if embodied in this charge, would tend rather to confuse your minds than aid you in digesting the proof. I repeat that what I have here said in regard to this proof is not to take the place of your own recollections of the testimony of each witness, for as to all these matters of fact you are the exclusive judges.

The proof clearly shows that Bruce Wheeler was a party to said conspiracy, and was killed on the spot in the prosecution of said conspiracy, about two miles east of Graham, and not later than a few minutes after 9 o'clock. The witness C. O. Joline testifies that near sundown of that day he met Bruce Wheeler about six miles from Graham, going north on the Farmer road; that he was acquainted with Wheeler; that he stopped and had a conversation with him, and asked Wheeler where he was going, to which Wheeler replied he was going up the country, or something to that effect. The proof shows that Verna Wilkerson lives near the Farmer road, and about nine miles north from Graham. The witnesses Burns and Spears testify that they recognized Verna Wilkerson in the mob that entered the jail Thursday night, (17th January,) only partially disguised by a knit cap drawn down over his forehead. The witness P. A. Martin testifies that he met Verna Wilkerson in the Johnson pasture, near the battle ground, and very soon after the firing ceased; that he (Martin) spoke to him, calling him Verna, and Wilkerson called the witness familiarly, "P. A.," as he generally did, and as many of his acquaintances do; that they had considerable talk together; that Verna Wilkerson said he thought he (Verna) got two of them (meaning the Marlows;) that after Bee Williams rode off, and he (Martin) had given Logan some whisky, and relieved his suffering somewhat, and he had seen the hack drive away with the surviving prisoners, and everything had got quiet, he and Verna Wilkerson went out of the pasture into the road, and examined the dead bodies together; and that they remained in conversation together until he (Martin) thought and remarked that it was time they were coming out from town, when Wilkerson, who had large spots of black on each cheek and on his forehead, said he had better go to the creek and wash his face, and left the witness, and went down the bank to where there was water in the creek,

and witness did not see him any more until after Mr. Duty and others arrived from town, when, as he and Mr. Duty were standing near the gate,—Mr. Duty on the west side of the gate and Mr. Martin nearly in the gate-way, but nearer the east side of it,—Verna Wilkerson rode out of the pasture, passing between Martin and Duty, and, as he rode by, saying, "Good evening," to which Martin responded, "Good evening," and without further words, or stopping at all, Wilkerson turned his horse to the east, and rode off in a brisk gallop in that direction. The witness Duty testifies that he and Martin were standing near the gate at the time and in the manner stated by Martin, when a horseman passed between him and Martin, and, turning east on the Weatherford road, immediately put his horse in a gallop, and continued in a brisk gallop as far up the road as witness noticed him,—40 or 50 yards; that he knew Verna Wilkerson well, was familiar with his general make-up, and tolerably familiar with his voice; that this horseman, as he rode by, said, "Good evening," and witness thinks "he suited for Verna Wilkerson." He did not recognize him at the time, but from what he saw and heard of that horseman then he now believes it was Verna Wilkerson. Witness asked Martin at the time if he knew that man, and Martin said he did; that it was one of the mob; and, being asked again who the man was, Martin said he would tell at the proper time, or that was not the proper time to tell, but beckoned his head north, and said it was a fellow that lived up the country. Verna Wilkerson lived north from there.

Mrs. Rickman testifies that on the evening of the 17th of January, 1889, she was at Mrs. Wallace's, widow of Sheriff Wallace, from soon after supper until 15 minutes past 9 o'clock. That a few minutes before 9 o'clock Tom Collier came in, and told Mrs. Wallace, calling her "aunt," that he was nearly dead for sleep; that he had not slept any for four days; and asked her if she could let him have a bed there that night; that he wanted to go to sleep. Mrs. Wallace said he could have a bed, but she would like for him to step up to the jail, and see how Marion (meaning the defendant Marion Wallace) is getting along. Tom Collier said Marion was all right, and he wanted to go to bed, but on Mrs. Wallace saying she wished he would first see about Marion before he laid down he went out. The witness did not know whether he went to the jail or to the lot where the horses were kept to put up his horse. That soon after Collier left Sam Waggoner came and asked for Collier, and on being told that Collier had just gone Waggoner too went out, having declined to stop, saying he wanted to see Tom. Before Mrs. Rickman went home Tom Collier came back, and told Mrs. Wallace that he could not sleep there that night; that he had to go out after a fellow that he had been wanting to get some time, named Vance; that he knew where he was then, and could get him, but if he waited until to-morrow it would be too late, for Vance would be gone; having said this Collier again left. Mrs. Rickman then lived only a little way from Mrs. Wallace, across the street, and a little north of Mrs. Wallace. She saw that evening in Mrs. Wallace's house and was introduced to three men whom she had never met before. She saw several men out by the cistern, and

she thinks she saw others about the premises, to the number, all told, in and out of the house, of 10 or 12 men. At 15 minutes past 9 her son came for her, and she remarked to him, when she met him at the gate and started home, that she did not understand what it meant,— there being so many men around there,—when her son said: "That's nothing, ma. Don't you know they are guarding the jail?" The defendant Marion Wallace testifies that on the 17th January, 1889, he ate supper at the usual hour at his aunt's, (Mrs. Wallace's,) where he boarded, and thinks John Levell, who also boarded there, ate supper with him. The witnesses Martin and A. T. Gay show that about ordinary bed-time on this night, 17th January, 1889, Sam Waggoner made a complaint by affidavit before Martin, the county attorney, against Jim Vance, who is shown to have been a lad about 16 years old, charging him with carrying a pistol; and Martin prepared an information on said affidavit; and Waggoner got from the witness A. T. Gay, who was county and district court clerk, a warrant for the arrest of said Jim Vance. The witnesses John Putman and his wife testify that at that time they lived about six miles from Graham, and about one mile from where the mother of Jim Vance then lived, and that about midnight on the night of said 17th January Mrs. Putman (not then married) heard the sound of horse's feet, as if ridden rapidly, approaching Mr. Putman's house, and come up to the gate. That she called Mr. Putman, who was in another room, and he got up and brought the men, who were Sam Waggoner and Tom Collier, into an adjoining room. That she did not see them that night, but could hear their talk, and learned from them on next morning that they had come out to arrest Jim Vance, but that they did not get him. She heard them say that night that they would have to be back in Graham the next morning by sunup. She prepared them early breakfast next morning, and they left about light. Mr. Putman says that when he first met them they said they were cold, and wanted to warm; and he took them into the kitchen, and started up the fire. That after they had sat a few minutes he asked them if they would not strip their horses, and put them up, and go to bed until morning. They said they would not take off their saddles; and he observed that their horses appeared to be warm, and one of them said he had lost his saddle blanket. That a few days after that he asked Sam Waggoner, in town, if he found his blanket, and Waggoner said the blanket come up all right. The witnesses Walter Hamilton and Dick Smith testify that on the evening of the 16th January they saw Sam Waggoner and Tom Collier together at Brison, in Jack county, and that, while Tom Collier was gone to the hotel to order supper, Sam Waggoner was talking to these witnesses about the Marlows, and said there ought to be a mob gotten up to make way with them. Mrs. Elizabeth Mosely testifies that at that time (17th January) she lived in her house about 10 or 20 feet east of the Young county jail; that she was at her home that night, and her attention was attracted by loud talking in jail, and the working of the doors of the cages in the jail; that she usually retired about 9 o'clock, and thinks she retired this night at her usual hour; that she was in bed when her at-

tention was thus attracted, and thinks she had been asleep; that she does not know what time in the night it was, but thinks it was not long after she had retired.   Charles Marlow and Burns testify that they saw and recognized Sam Waggoner in the mob that attacked the cage in the jail the night of the 17th January.   Less Randolph testifies that a short time after the Dry creek fight he rode with Sam Waggoner from somewhere near Graham, on the Belknap road, to Belknap, and on that trip Sam Waggoner told him all about the mob at the jail on 17th, and told witness that he, Sam Waggoner, was there.   This witness says Waggoner also told him about the Dry creek fight, and said it was a good thing that Frank Harmeson was killed, because he would have given the whole thing away.   Mrs. Lauderdale testifies that a month or two after the Dry creek fight she saw Sam Waggoner in Graham, and wanted to know from him how Sam Criswell was killed, or who killed him; and that Waggoner said that he could not tell her who killed Mr. Criswell; that if he had met her a day or two after the fight he could have told her all about it, but he said, "The way they have got these boys tied up now, I never can tell you."

Miss Lizzie White testifies that Sunday morning after the Dry creek fight she heard Will Hollis say in the hotel called the "Bell House," in Graham, that his buggy was stopped in the creek; that two brothers, whom he knew, were there,—the one on the one side of the buggy, and the other one on the other side; that he saw one of these brothers in Graham as he (Hollis) was coming to the hotel; that when he (Hollis) saw his friends being shot down he wanted to fire into them, but they would not let him, and he (Hollis) thought it was very hard that he could not be allowed to help his friends.   He said further 'that he did not believe there was any God, or he would not allow good men to be killed in that way.   Joe White's testimony is substantially to the same effect.   He says that Will Hollis appeared to him to be drunk when he was having this talk.

Burns, Spears, Charles Marlow, and George Marlow all testify that the defendant Dick Cook, known then to them by the name of Dick Perkins, but the same man as the defendant Dick Cook, had been a guard at the jail, and was well known by sight to all of these witnesses; and they each testify that they recognized said Dick Cook with the mob that attacked the cage in the jail.   Spears and Burns say that Cook at the time had on a knit cap, and that all of the crowd except John Levell and Marion Wallace had on old clothes, or fancy and outre style of dress, by way of disguises; but that Dick Cook's face was not otherwise disguised than by the knit cap covering his forehead.   The witnesses recognized him in the mob by a scar on his face, and by his having only three fingers on one hand.

The witnesses E. S. Graham, Marion Lasater, John Taylor, F. W. Girand, and others testify to the existence of an apprehension here on the part of many observant citizens that there was the possibility, if not a probability, of a mob being formed to lynch the Marlows.   So much impressed with this apprehension was E. S. Graham that he, in com

pany with Mr. Ed Norman, went to the residence of Commissioner Girand, at night, after Mr. Girand had gone to bed, and got him up, and expressed to him the fear that the prisoners might be attacked in the jail, and desired him to advise the deputy-marshal, so that proper precautions might be taken. The only cause known to any of these witnesses for these rumors and apprehensions of a mob was the shooting and death of the sheriff, Wallace. It is shown that the defendant Marion Wallace is a nephew of the said sheriff, Wallace; that before Sheriff Wallace was shot the defendant Marion Wallace lived on his said uncle's farm, near Belknap; that after the death of Sheriff Wallace and the appointment of Tom Collier as sheriff, Collier appointed Marion Wallace deputy-sheriff, and he was much about the jail, and acting as such deputy-sheriff about the jail in relation to the custody of the Marlows and other prisoners. It is shown that John Levell had been Sheriff Wallace's office man and collector of taxes for several years, (the sheriff being *ex officio* collector of taxes,) and was continued in the same office by Tom Collier when he became sheriff; that John Levell and Marion Wallace both boarded at the house of Mrs. Wallace, widow of Sheriff Wallace. Mrs. Rickman testifies to the solicitude Mrs. Wallace expressed about Marion, (meaning the defendant Marion Wallace,) and her repeated requests to Tom Collier on that evening to go to the jail and see about Marion. The witnesses Burns, Spears, Charles Marlow, and George Marlow substantially agree in their testimony that on the night of the 17th January, when the mob entered the jail, and first came up-stairs where the cages were placed, John Levell came first with the keys to the cage door, and opened the doors, and called Charles Marlow, and told him to come out, that there was a man there who wanted to see him; and when Charles Marlow answered, "Who is it, and what does he want with me?" Levell replied, "I do not know, but come on out." That just then Spears told Charles not to go; that it was a mob; and George Marlow told John Levell, "I did not think you would do this way. I have laid here and begged you for water until ten o'clock at night, and you said the keys were at the office, but now you can open the cage for these fellows to kill us;" to all of which John Levell said nothing, but Logan said: "Shut up; John Levell is under arrest." That when one of the mob, not recognized by any of the witnesses, had stepped into the door of the cage, and been knocked down by Charlie Marlow with his fist, and had said to his fellows, "You must take me down from here. I am bleeding to death,"—some of the crowd pulled him out of the door, and they all disappeared from the cage, and from the sound of their steps on the stairway these witnesses knew that some of the crowd, and possibly all of it, went down-stairs. That very soon the mob came back up-stairs, and this time with Marion Wallace in the lead. That all the prisoners except the four Marlow brothers were called out of the north cage, where they had been all confined together, and placed in the other cage. That Logan then told Marion Wallace to go to the north cage, and bring Charlie Marlow out; and that Marion Wallace advanced to the door of the cage, but when he saw that Alford had the

piece of water-pipe in his hand he stopped and said, "I am not going in there to be killed." These witnesses all testify that no violence was offered by any person in the mob to either John Levell or Marion Wallace, and no threatening language was used to either of them; but both John Levell and Marion Wallace seemed to these witnesses to be acting with the mob, and all one with it. Burns and Spears both testify that they were in the jail when Sheriff Wallace was shot, and saw John Levell bring Lewellin or Eph Marlow to the jail on that day; that Eph objected to being put in the cage without anything to sleep on or be on, and that John Levell, cursing him as he put him in the cage, said to Eph: "You don't need nothing. Go in there, and we will go and mob the rest of them;" and Burns says he saw Levell kick him as he put him in. The witness Moore testifies that in 1888 and 1889 he was sheriff of Jack county, and that on the night of the fight at Dry creek Marion Wallace and another man came to Jacksboro to get him to aid the officers of this county with a *posse* from Jack county; that he had no communication with the other man, but received the request and all his information on the subject from Marion Wallace, and the impression he received, and on which he summoned his *posse* and brought it into Young county, was that the mob were friends of the Marlows, and that all the men who were killed except the two Marlows were guards, and that he remained under this impression until after his arrival with his *posse* at the Denson farm, when Jim Duty informed him of the real situation, and he took his *posse* back to Jack county. Charles Auberg testifies that in January, 1889, he was a commissioned member of the state police, and that on Sunday, the day after the Dry creek fight, he saw Marion Wallace at the Denson farm; that said Wallace said he was going to take the Marlows out of their cabin; that witness remonstrated with him, stating the situation fully, and forbade it, saying to Wallace, "I have the right to forbid it, and you know it;" that Wallace was intensely excited, and said that Charlie Marlow had killed his uncle, and that he was determined to have revenge, and would take them out; when the witness told him that he would have to kill him before he took the Marlows out. The witness Perry Harmeson says that he is the father of Frank Harmeson, who was killed in the Dry creek fight; that he was in Jacksboro the night of the Dry creek fight, and early the next morning he learned from Marion Wallace that his son Frank was killed, and the names of the others who were killed, and that Marion Wallace told him that his son and Bruce Wheeler and Sam Criswell were all guards, and were attacked and slain by the mob; that he came at once to Graham, and was greatly excited and highly indignant at the suddenness and manner of his son's death, having left him in health at his (Frank's) house Saturday morning; that witness said publicly and repeatedly on his arrival at Graham that he had $1,000 or $10,000 that he would give for the capture of those who killed his son; and that he continued talking that way, and feeling and thinking that way, until some one, he thinks E. S. Graham, spoke to him, and let him know how it was. The witness A. B. Gant testifies that he was in Levell's office Monday after the Dry creek fight, and made some remark

to Levell about it that day, and Levell cursed and swore about it, and said that all he regretted about it was that they did not kill every one of the Marlows, and said the Marlows had threatened him and Tom Collier. Witness heard Levell say that they could not convict Charles Marlow on the proof that they had, and that, if they did convict him, the court of appeals would reverse it, and instanced a case in Stephens county, where a boy was convicted for killing his father and the court of appeals reversed it. Witness heard this, when the mob was talked of, as reasons for the mob. The witness Lovejoy testifies that at sundown on the evening of January 19, 1889, he went into the sheriff's office, where John Levell was in the habit of receiving taxes, to pay his tax. That he found quite a crowd—10 or 15, may be 18, men—in there. Of this crowd he knew John Levell, Robert Holman, O. E. Finlay, and Frank Harmeson. The crowd were talking in a general way. Witness did not gather what they were talking about, but knew there was whisky there from the appearance of things, and some of them pretty well filled up with whisky when witness went in there; and witness, as he stepped up to pay his taxes, said to the crowd, "Who was the man that paid for the whisky?" when Frank Harmeson said to him, "You can have some whisky if you want any. There is no trouble about that." Witness had no personal acquaintance with Frank Harmeson; only knew him by sight. And a few minutes after this Mr. Finlay said to witness, while still there in the room with the crowd, "You will hear something before morning;" and witness left in a few minutes. This was the last day for paying taxes without a penalty. Levell was representing the sheriff as tax collector. He had a desk there. He received witness' tax. Witness did not see him receive any other tax while there. He looked over the books and tax-rolls, and gave witness his receipt. When Finlay said to witness, "You will hear something before morning," he spoke so no one else heard it.

A great number of witnesses have testified for the defendants, but their testimony has been chiefly of an impeaching character, and I deem it impracticable and unnecessary for me to tax myself or you with an attempted summing up of this mass of that character of testimony. It has been fully presented to you by the very able counsel representing the defendants, and will doubtless substantially all recur to you in your consideration of the testimony of the witnesses for the government, whose credit, or the weight of whose testimony, this testimony of the defendants is offered to attack and destroy. And I again repeat that all the testimony you have received during this trial is to be considered by you, and you are to rely upon your own recollections and impressions of the testimony, and to act on your own judgment of the proof as to all questions of fact involved in this trial.

2. When a citizen of the United States is committed to the custody of the United States marshal or to a state jail by process issuing from one of the courts of the United States, to be held, in default of bail, to await his trial, on a criminal charge, within the exclusive jurisdiction of the national courts, such citizen has a right, under the constitution and laws

of the United States, to a speedy and public trial by an impartial jury, and, until tried or discharged by due process of law, has the right under said constitution and laws to be treated with humanity, and to be protected against all unlawful violence, while he is deprived of the ordinary means of defending and protecting himself.

3. The laws of the United States provide that if two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the United States they are guilty of an offense; and if, in the prosecution of any such conspiracy, any murder be committed, the offenders shall be punished (in the United States courts) for such murder with such punishment as is attached to the offense of murder by the laws of the state in which the offense is committed. By "conspire," as used in the law just given you, is meant to agree with one another to effect the unlawful object; to combine and confederate together to encourage, assist, and support each other in effecting said unlawful object. This agreement need not, and often is not, expressed in words, but is to be gathered from the conduct of the parties to it. The offense of murder referred to is: "Where a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the United States, with malice aforethought, either express or implied." Malice aforethought is a deliberate intent to kill another unlawfully, and where the unlawful killing is done by the use of deadly weapons the law implies malice, and where lying in wait or the existence of antecedent grudges is shown, the presence of either of these ingredients, accompanying such unlawful killing, manifests that the law pronounces "express malice." By the laws of Texas, all murder committed with express malice is murder in the first degree, and all murder not of the first degree is murder of the second degree; and if the jury shall find any person guilty of murder they shall also find by their verdict whether it is of the first or second degree.

4. The proof in this case all goes to show beyond any doubt whatever that there were more than two persons who assailed the prisoners at Dry creek on the night of January 19, 1889, and that said assailants had lain in wait on the highway for the hack containing said prisoners, and that the killing of Alf and Eph Marlow, under the undisputed circumstances leading up to and attending their killing, was a cruel assassination, and murder in the first degree. And the proof all shows with equal clearness that the persons stopping said hack and assailing said prisoners with drawn weapons had combined together to injure, oppress, threaten, and intimidate said prisoners, and to deprive them or some one of said prisoners of the right secured to them by the constitution and laws of the United States,—to a speedy public trial by an impartial jury, and to be protected from unlawful assault or violence while in the custody of the deputy United States marshal, under lawful process of the courts of the United States.

5. The spirit of our laws is such that each particular one of these defendants is presumed to be innocent until his guilt is established by proof

that shall satisfy your minds beyond a reasonable doubt; and the certainty that a great crime has been committed by some persons, and the circumstances of horror attending its commission, must not be permitted to bias your minds in weighing the proof which you are now to consider in order to determine whether these defendants, or either of them, were parties, or was a party, to said conspiracy.

6. Each person who joins a conspiracy at any time, whether at its inception or after its inception, becomes a conspirator, and liable for all that is done at any time in the prosecution of the conspiracy to effect its unlawful object. Each co-conspirator is liable for the acts, and is bound by the declarations, of each of his co-conspirators, done and said during the continuance of the conspiracy, touching the object and conduct of the conspiracy. It is immaterial at what time he became connected with it,—whether at its inception or at the very instant before the full accomplishment of the purpose of the conspiracy, or just before its final abandonment, or at any intermediate time; his connection with it at any time makes him liable for all that has been done by any of his co-conspirators in pursuance of the conspiracy.

7. But to establish the connection of either of the defendants now on trial with the conspiracy charged in this case such connection must be shown by other proof than the declarations of others made out of the witness-box, and not in the presence of the defendant charged; and this applies as well to the declarations of any one of the defendants, made not in the presence of the one whose connection or not with the conspiracy is being considered. Each defendant's own declarations, made at any time, and the declarations of any other persons, made in his presence, are competent to be considered in passing on the question as to whether said defendant was connected with said conspiracy.

8. To establish the connection of a particular defendant with the conspiracy it is not necessary that there should ever have been an explicit agreement by him to form the conspiracy, or to join it; nor is it essential, or often possible, that direct proof should be made of his connection with it. In cases like this—prosecution for criminal conspiracy—the connection of particular individuals with the conspiracy must almost always be extracted from the circumstances connected with the transaction which forms the subject of the accusation. It is as competent to prove such connection by circumstances as by direct evidence. But these circumstances must each be proved to your satisfaction beyond a reasonable doubt, and the circumstances thus proved must be such that, when they are all considered together, they satisfy your mind beyond a reasonable doubt that the said defendant co-operated with said conspiracy.

9. You are the exclusive judges of the credit to be given to each witness, and of the weight of his or her testimony. The government has introduced two witnesses who are shown to have been heretofore convicted of offenses, and punished by imprisonment,—one in the county jail for six months, and the other in the state penitentiary for two terms of two years each. They are competent witnesses, but the matter of their respective convictions and sentence is to be considered by you in

determining what credit you should give them as witnesses, and what weight you will allow to their testimony.

10. There is proof tending to show that two of the witnesses for the government, P. A. Martin and E. W. Johnson, were connected with the said conspiracy; and if you believe from the proof that either of them was a member of the conspiracy you should receive his testimony with great caution, and should not convict either of the defendants on his unsupported testimony,—that is, unless you believe, that as to said defendants' connection with the conspiracy said testimony is corroborated by other evidence in the case. They cannot for this purpose be considered to corroborate each other.

11. There is a direct and sharp conflict of testimony in this case, and much proof has been given you which could not be embraced in my summing up, offered by each side,—the government's and the defendants',—tending to discredit the witnesses offered by the opposing side, all of which you are to consider in weighing the evidence of the witnesses attacked, and give such weight to it as in your judgment it should receive. Like as all reasonable men in the ordinary walks of life do, you should in this case judge of the testimony of each witness by the manner in which it is given; the opportunity of the witness to know the matters to which he deposes; the consistency of his testimony with itself and with all the known or otherwise fully proved facts of the case; the manner in which he stands the crucial test of cross-examination; his relation to this case as a party defendant, or his relation to any of the defendants, or to any of the witnesses, or to the transaction out of which this case grew, as well as the evidence as to his general character and standing; and thus determine for yourselves as to each of the witnesses the extent of the credit you should give to his testimony.

12. If, from a consideration of the whole proof in this case, you are satisfied beyond a reasonable doubt that such a conspiracy as is charged in the indictments did exist, and that in the prosecution of said conspiracy the conspirators, or a part of them, in pursuance of said conspiracy lay in wait for said prisoners, and assaulted them by presenting against said prisoners deadly weapons, and that said assault resulted in the death of Alf and Eph Marlow, as charged in said indictment; and you further, from the proof, believe beyond a reasonable doubt that either one of the defendants now on trial was connected with the said conspiracy,—you should find that one guilty of conspiracy as charged in the indictment, and of murder committed in the prosecution of said conspiracy. If the proof so satisfies you that two or more of the defendants now on trial were connected with said conspiracy, you should find said two or more guilty. And if it so satisfies you as to each of the defendants now on trial, you should find all of said defendants guilty as charged. If you are not satisfied from the proof beyond a reasonable doubt as to any certain one of the defendants being connected with said conspiracy, you must acquit that certain one. If you are not satisfied beyond a reasonable doubt that any certain two or more of the defendants now on trial were connected with said conspiracy, you must acquit said two or more

of the defendants. And if you are not satisfied beyond a reasonable doubt that either one of the defendants now on trial was connected with said conspiracy you must acquit all of them.

13. If, from the proof, you believe beyond a reasonable doubt that the defendant Eugene Logan was at any time connected with said conspiracy, or, knowing that said conspiracy existed, acted with the conspirators, or gave to any of them information, or counsel, or advice, or encouragement, or assistance connected with the said conspiracy, the fact (if it be the fact) that he accepted the position of a guard would not lessen his liability or his guilt.

14. If from the proof you believe beyond a reasonable doubt that either of the defendants Marion Wallace or Sam Waggoner or Will Hollis was at any time connected with said conspiracy, or, knowing that said conspiracy existed, acted with the conspirators, or gave to any of them information, or counsel, or advice, or encouragement, or assistance connected with said conspiracy, the fact that he went with said prisoners as a guard would not lessen his guilt or his liability to punishment.

15. If from the proof you believe beyond a reasonable doubt that the defendant E. W. Johnson was connected with said conspiracy, or, knowing that it existed, colluded with the conspirators, or gave to any of them information, or counsel, or advice, or encouragement, or assistance of any kind in the prosecution of said conspiracy, the fact that he was a duly-authorized deputy United States marshal at the time, and as such had said prisoners in his custody under lawful process, would not lessen his guilt or his liability to punishment, or lessen the guilt and liability to punishment of any other party to the conspiracy.

16. The rule of law which clothes every person accused of crime with the presumption of innocence, and imposes on the government the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid any one who is in fact guilty of crime to escape, but is a humane provision of law, intended, so far as human agencies can, to guard against the danger of any innocent person being unjustly punished. And you are instructed as a matter of law that in considering this case you are not to go beyond the evidence to hunt up doubts, nor must you entertain such doubts as are merely chimerical or conjectural. A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and unless it is such that, were the same kind of doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt. It is the law that the doubt which the juror is allowed to retain on his mind, and under the influence of which he should frame a verdict of not guilty, must always be a reasonable one. A doubt produced by undue sensibility in the mind of any juror in view of the consequences of his verdict is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful supposi-

tions and remote conjectures as to possible states of fact differing from that established by the evidence. You are not at liberty to disbelieve or doubt as jurors, if from the evidence you believe as men. Your oath imposes on you no obligation to doubt when no doubt would exist if no oath had been administered; but, on the contrary, your oath does impose on you an obligation not to doubt whenever no doubt would exist had no oath been administered.

17. There are in this case five different indictments, each containing more than one count; and some of them containing numerous counts, but, taken all together, they charge substantially only two offenses: *First.* That the defendants now on trial, with certain others named in the indictments, and still others to the grand jurors unknown, conspired to injure, oppress, threaten, and intimidate the citizens of the United States named in said indictments in the free exercise and enjoyment of the right secured to them by the constitution and laws of the United States to be protected from all unlawful violence while in the lawful custody of the officers of the United States on a criminal charge, and to have the benefit of a speedy public trial by an impartial jury. *Second.* That in the act of carrying out said conspiracy, said conspirators committed the capital felony of murder, as charged in the indictments. The defendants may be found guilty of the first of the above charges, and not guilty of the second, or they may be found guilty of both, or not guilty of either, according to your view of the proof. But they cannot be found guilty of the charge of murder unless the proof shows they were parties to the conspiracy. It is entirely immaterial and wholly unnecessary for you to know or find what one or ones of the conspirators fired the fatal shots that killed Alf Marlow and Eph Marlow. Each person shown by the proof beyond a reasonable doubt to have been connected with said conspiracy is guilty of their murder, whether such person was at the Dry creek fight or not. You will be careful to so frame your verdict as to show clearly what you find in reference to each one of the defendants now on trial, naming each one of said defendants in your verdict. In this court the jury do not assess the punishment, the law devolving that duty on the trial judge in every case of conviction; the office of the jury being only to find and show by their verdict whether the defendants on trial are guilty or not, and, if guilty in this case of the charge of murder, to show by their verdict the degree of the murder. If you find the defendants now on trial, or either of them, guilty only of conspiracy, as charged in the indictments, your verdict as to such defendants or defendant should be substantially in this form:

"We, the jury, in consolidated case number 34, the United States against Eugene Logan and others, find the defendants (naming each so found) guilty of the conspiracy as charged in the indictments. And we further find said defendant not guilty of the murder charged in said indictments."

If you find the defendants now on trial, or either of them, guilty both of the conspiracy and of the murder charged in said indictments, the form of your verdict should be, in substance:

"We, the jury, in consolidated case number 34, the United States against Eugene Logan and others, find the defendants or defendant (naming each so found) guilty of the conspiracy as charged in the indictments and of murder in the ——— degree, (naming the first or second degree as you may find it to be,) as charged in the indictments."

You perceive that you may find separate and distinct verdicts as to each of the defendants now on trial. If you acquit the defendants, or either of them, of both charges, your verdict as to such defendants or defendant should be:

"We, the jury, find the defendants (naming each) not guilty."

———————

Verdict: "Guilty of conspiracy, as charged, as to Eugene Logan, Sam Waggoner, and Marion Wallace; not guilty as to others on trial."